SCOTT STAFNE, WA BAR#: 6964
239 NORTH OLYMPIC AVE
ARLINGTON, WA 98223
TEL: (360) 403-8700

GARY L. ZERMAN, CA BAR#: 112825
23935 PHILBROOK AVE.
VALENCIA, CA 91354
TEL: (661) 259-2570

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| CITIZENS FOR FAIR EPRESENTATION; SHASTA NATION TRIBE; CITY OF COLUSA; CITY OF WILLIAMS; THE CALIFORNIA AMERICAN INDEPENDENT PARTY; THE CALIFORNIA LIBERTARIAN PARTY; MARK BAIRD; CINDY BROWN; WIN CARPENTER; KYLE CARPENTER; JOHN D'AGOSTINI; DAVID GARCIA; ROY HALL JR; LESLIE LIM; MIKE POINDEXTER; MICHAEL THOMAS; LARRY WAHL; and RAYMOND WONG.<br><br>*Plaintiffs,*<br><br>v.<br><br>ALEX PADILLA, SECRETARY OF STATE FOR CALIFORNIA; CITIZENS REDISTRICTING COMMISSION; and THE STATE OF CALIFORNIA<br>*Defendants.* | Case No.: 2:17-cv-00973-KJM-CMK<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR UNCONSTITUTIONAL VOTE DILUTION IN THE CALIFORNIA ASSEMBLY & SENATE**<br><br>*THREE-JUDGE COURT REQUESTED [28 U.S.C 2248]* |

SECOND AMENDED COMPLAINT                    1

# I.  INTRODUCTION

For more than 150 years, California has capped the size of the state legislature. Despite the enormous population increase of over 39,000,000 (Thirty-Nine Million) people the legislature is limited to only 40 members of the senate and 80 for the Assembly. Constitutionally capping the number of members of California's legislature, in 1879, was intended to and did reduce the representation of non-whites. California's legislature  is now dominated by a static number of powerful elite politicians in districts which are constantly expanding, effectively leaving plaintiffs unrepresented because their interests can and have been systematically ignored.

By maintaining these arbitrary caps, California has perpetuated a system of oligarchic governance at odds with the norm of self-representation at the heart of the U.S. Constitution. As a result, California violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment, as well as the First Amendment, and denies to plaintiffs a republican form of government as guaranteed by Article IV and the federal structure of the U.S. Constitution.

California could easily remedy these constitutional violations simply by significantly apportioning a larger number of members to the assembly and senate.  Many other states have significantly larger legislatures.  If California determines that expanding the legislature to remedy past invidious racial discrimination is unworkable, the state has the option of initiating the process prescribed in the U.S. Constitution to break the state into two or more new states. *See* U.S. Const., Art. IV, § 3, cl. 1.

The issue here is that California is "locked in" to this unconstitutional system by its own history.  However, because members of the Assembly and Senate would lose their political power if they solved this dire problem, instead they will continue to do nothing to redress  plaintiffs'

grievances and injuries, and only judicial intervention by this Court can remedy the constitutional violations set forth herein.

## II.  PARTIES

1.0 Citizens for Fair Representation ("CFR") is a "not for profit" corporation that promotes and educates Californians regarding their rights to participate in a democratic representative republican government.   CFR's members include U.S. citizens and residents in California comprised of different races, ethnicities, religions, and political beliefs located in various legislative districts throughout the state.   CFR's members have effectively been disenfranchised from California's political legislative process and voting because they reside in such populous legislative districts that CFR's member's interests, needs, and concerns are routinely ignored by California's bicameral legislature.

1.1 CFR's members have been harmed in specific and concrete ways because California's cap on the size of the legislature was imposed as part of California's ratification of constitutional provisions in its 1849 and 1879 Constitutions, which were intended to invidiously and systematically promote the interests of whites over non-whites.

1.2 Plaintiffs Win Carpenter, Kyle Carpenter, and Roy Hall Jr., are Native Americans who reside and vote in California Senate District 1.  Hall is chief of plaintiff Shasta Nation Tribe of Indians which has about 1200 members.  They are part of a racial class of approximately 650,000 Native Americans in California whose members have been intentionally, systematically, and invidiously discriminated against by California since statehood, including through the intentional attempted genocide of their race in California. The decimation of the Native American population coupled with the unconstitutional cap on the size of the legislature which results in the population

of the Assembly and Senate districts growing larger and larger over time have denied Native Americans any opportunity to elect a member of their race to a statewide legislative body.

1.3 David Garcia is a Latino/Hispanic[1] (Mexican) U.S. citizen residing and voting in California Senate District 8, which is composed of 11 counties.  Hispanics have been intentionally, systematically, and invidiously discriminated against by California in numerous ways, including intentional extermination and forced expulsion of Hispanic U.S. citizens and voters from California, beginning at statehood and continuing at least through the 1930s. The cap on the size of the legislature is an integral part of a constitutional and legislative framework dating to the Nineteenth Century to dilute the political power and abridge the votes of Hispanics, causing plaintiff Garcia and others similarly situated Hispanics grave economic, social, and stigmatic injuries as members of a racial and ethnic minority.  Further, their ability to elect candidates of their choice to the legislature has long been seriously impacted.

1.4 Raymond Wong and Leslie Lim are U.S. citizens of Asian descent who reside in California Senate District 32 and District 21 respectively, both of which are composed of only two counties. Asians, especially persons of Chinese, Mongolian, Japanese descent as well as those who provided "Coolie" labor before 1879, have been intentionally, systematically, and invidiously discriminated against by California in ways that the state has formally admitted,  through their intentional killing, forced expulsion, internment, and other intentional discrimination based on their race from the 1850s through at least the 1950s. The cap on the size of the legislature is an integral part of a constitutional and legislative framework dating to the nineteenth century to dilute

---

[1] The U.S. Census Bureau defines the ethnonym Hispanic or Latino as "a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race" and states that Hispanics or Latinos can be of any race, any ancestry, and any ethnicity. See https://www.census.gov/topics/population/hispanic-origin/about.html. This complaint uses "Hispanic" to refer to a member of this group.

SECOND AMENDED COMPLAINT                  4                    STAFNE LAW

the political power and abridge the votes of Wong and Lim and other similarly situated Asians, resulting in grave economic, social, and stigmatic injuries to them as members of a racial minority. Further, their ability to elect candidates of their choice to the legislature has long been seriously impaired.

     1.5 Cindy Brown is a black U.S. citizen who lives in Senate District 37, which is located wholly within Orange County, California.  Brown and other blacks have been intentionally, systematically, and invidiously discriminated against by California in numerous ways that have been formally admitted by the state, including being denied the right to vote by the 1849 Constitution, subjected to "Jim Crow" race laws following the 1879 Constitution, and subjected to voter disenfranchisement for felony convictions based on race by California courts, which have a long history of intentionally discriminating against blacks. Brown alleges the 1849 and 1879 constitutions, including the 1879 constitutional cap on the size of California's statewide legislative bodies, has in the past and continues now to dilute black political power by abridging the value of their votes based on race. As an example, Brown alleges the capped legislature refuses to oversee the corruption of California's judges and courts that incarcerate and impose felony sentences (which impacts the right to vote) of non-whites.

     1.6 This dilution of political power has resulted in grave economic, social, and stigmatic injury to plaintiffs Mark Baird, Carpenters, John D'Agostini, Mike Poindexter, Michael Thomas, and Larry Wahl, U.S. citizens who live and vote in California senate districts composed of 8 or more counties. Plaintiff cities of Colusa and Williams are rural municipalities within Senate District 4 (which is composed of 8 counties.) These Plaintiffs allege that California's constitutional cap of 40 senators and 80 assembly persons, which was born out of the invidious discrimination against non-whites described herein, now causes them injury.

SECOND AMENDED COMPLAINT      5

1.7 Plaintiffs the California American Independent Party and The California Libertarian Party are minority political parties that have substantial numbers of registered members in California, but their ability to elect candidates of their choice is seriously undermined by the constitutional framework dating back to the 1900's to dilute the value of non-white people's votes by capping the number of senators and representatives.

1.8 Most plaintiffs have petitioned or requested (some repeatedly) their legislators as well as defendant Secretary of State Padilla for constitutionally adequate representation. None have received a response from representatives who are supposed to serve them.

1.9 Defendant Alex Padilla is the Secretary of State for California and has duties to oversee the election laws of California so as to ensure compliance with the U.S. Constitution.

1.10 Defendant Citizens Redistricting Commission [CRC] is a body created by Article XXI of the California Constitution which may have the power to increase the apportionment of both houses of the state legislature according to specific criteria, including compliance with the U.S. Constitution, reasonably equal populations with other districts for the same office, geographic contiguity and compactness, and respect for existing jurisdictional lines (such as cities and counties).

1.11 Defendant State of California is a sovereign state of the United States.

### III.  JURISDICTION AND VENUE

2.0 This action arises under the U.S. Constitution and statutes enacted thereto. U.S. Const. Art. III, § 2.

2.1 Jurisdiction in this Court exists under 28 U.S.C. §1331 and §1343(3)-(4). Supplemental jurisdiction over state law matters exists pursuant to 28 U.S.C. §1367(a).

2.2 Under 28 U.S.C. §2284 (a), a three-judge court must be convened to decide this case because it challenges the constitutionality of California's apportionment of its statewide legislative bodies.

2.3 Venue is proper under 28 U.S.C. §1391(b), because the Defendant Padilla's office is located in Sacramento, California.

## IV.  FACTUAL ALLEGATIONS

3.0 California became a state of the U.S. on September 9, 1850.  Under the state constitution then in effect, the Assembly had 36 members; the Senate was apportioned with 16 members.  In 1854, the Assembly was increased through statute to 80 members; in 1862, the Senate was expanded by statute to 40 members.  These caps were memorialized in California's constitution in 1879 for the purpose of targeting non-whites' ability to participate politically in California's government, including its legislature. The caps remain today as a vestige of past invidious, intentional, systematic, and stigmatic state discrimination against non-whites.

3.1 The population of California according to the 2010 census was about 38 million; currently it is about 40 million people.  Thus, today each Assembly member represents almost 500,000 people; each Senator represents about one million people.

3.2 As California's population grows, the cap on its number of legislators will cause ever larger Assembly and Senate districts.  The California Department of Finance estimates California's population in 2020 will be will be 40,639,000, rising to 43,939,250 in 2030, 46,804,202 in 2040, 49,077,801 in 2050, and 50,975,904 in 2060.

3.3 On Sept. 1, 1849, California held its first Constitutional Convention, which resulted in ratification of the state's first constitution on November 13, 1849.  At this convention, the overwhelmingly white male delegates ratified a Constitution eliminating the existing suffrage

rights of all Native Americans, blacks, and non-white persons of Mexican descent, because they feared loss of control of California to non-whites. Art. II, § 1, expressly limited suffrage to *only* white males, including white male Mexicans who declared U.S. Citizenship.

3.4   At its very first session, the California Legislature enacted an ironically named "Act for the Government and Protection of Indians."   This statute was utilized to make Native Americans slaves or their equivalents in peonage, and to deprive them of basic human rights they had enjoyed prior to California's statehood. Under this law, "in no case shall a white man be convicted of any offense upon the testimony of an Indian or Indians."  This law, particularly as it was amended in 1860, facilitated the removal of Native American children from their families and tribes into a system of virtual slavery or indentured servitude.  It also allowed whites to pay criminal fines of Native Americans, with the result that they became trapped in a system of peonage enforced by the California courts.

3.5 In 1851, California Gov. Peter Burnett declared that "a war of extermination will continue to be waged . . . until the Indian race becomes extinct."  In 1852, U.S. Sen. John Weller — who became California's governor in 1858 -- told the U.S. Senate that California Indians "will be exterminated before the onward march of the white man," and argued that "*the interest of the white man demands their extinction*."

3.6 The State of California in the nineteenth century paid bounties for the scalps and severed heads of Native Americans.  From the time of statehood until the 1930s, 5/6ths of the remaining California indigenous population was killed by settlers. By then, the Native American population, which had once totaled hundreds of thousands in California, was less than 30,000.

3.7 The United States, including the Bureau of Indian Affairs, has formally apologized to the Native Americans for the genocide and atrocities perpetrated against them because of their

STAFNE LAW
Advocacy & Consulting
239 N Olympic Avenue
Arlington, WA  98223
(360) 403 - 8700

race. California, through Governor Brown, has acknowledged the racial genocide of its native people. *See* Exhibit 1. Several California counties have also apologized.

3.8 Hispanics, especially those of Mexican ancestry, were treated similarly to Native Americans that is systematically discriminated against by California on account of their race.  As a group, non-white Mexicans were denied citizenship and serious efforts were made to remove them from the state and the United States.

3.9 During the Gold Rush, owners of railroads and mines in California solicited Mexican and Asian people, especially Chinese workers, to come to the state as a source of cheap labor. Indeed, the populations of non-white groups increased dramatically to the point where they began competing with white workers for jobs. At that point, the state began a systematic effort to eliminate them from its borders.

3.10 Following statehood, the all-white California legislature enacted intentionally discriminatory legislation against persons of Asian descent, particularly Chinese. The California Supreme Court declared some of these laws to be unconstitutional as early as 1862. "No one can read these [laws] and fail to see that they are all directed by the same spirit; hostility to the Chinese, and an intention to banish them from the country." *Lin Sing v. Washburn*, 20 Cal. 534, 538-9 (1862).

3.11 Racial violence was frequent in San Francisco in 1877.  On Oct. 16 the Workingmen's Party (one of three of the three major parties) Manifesto was published in the San Francisco Chronicle:

> We have made no secret of our intentions. We make none. Before you and before the world we declare that the Chinaman must leave our shores. We declare that white men, and women, and boys, and girls, cannot live as the people of the great republic should and compete with the single Chinese coolie in the labor market. We declare that we cannot hope to drive the Chinaman away by working cheaper than he

STAFNE LAW
Advocacy & Consulting
239 N Olympic Avenue
Arlington, WA  98223
(360) 403 - 8700

does. . . . **_To an American, death is preferable to life on par with the Chinaman_** (emphasis added)

[*History of Political Conventions in California 1849 - 1892* (1893) by Winfield J. Davis, Chapter XXVII, 1877--Workingmen's Party and the Kearney Excitement, pgs. 368-369.]

3.12 From September 1878 through March 1879, California held a second constitutional convention, a primary purpose of which was to advance the interests of whites by invidiously discriminating against Chinese and Mongolian people.  At that convention, 50 of the 152 delegates were Workingmen's Party members.  The recorded debates from the Convention show that most delegates considered non-whites as inferior to whites.  In a representative statement, one delegate avowed that Chinese people should not be counted in apportionment of the legislature, because "[w]e count them as chattel or stock." 2 DEBATES AND PROCEEDINGS OF THE CALIFORNIA CONST. CONVENTION OF 1878, at 755 (E.B. Willis & P.K. Stockton, eds. 1880).

3.13 The 1879 constitution promoted oligarchic legislative bodies that excluded non-whites.  For example, Article II, § I of that constitution was rewritten to provide "no native of China," shall ever vote in California.

3.14 Article IV, § 5 of the 1879 constitution imposed the caps on the size of the Assembly (80) and Senate (40) that remain in effect today.  The predominant purpose and/or motivating factor for these caps was to promote the white man's interests by the exclusion of non-white people from participating in California's political processes.

3.15 The 1879 Constitutional Convention also included an article intended to remove or cause the removal of Asians and other non-white workers from the state.  This provision, Article XIX, titled "CHINESE," provided:

Sec. 1. The Legislature shall prescribe all necessary regulations for the protection of the State, and the counties, cities, and towns thereof, from the burdens and evils arising from the presence of aliens who are or may become vagrants, paupers, mendicants, criminals, or invalids afflicted with contagious or infectious diseases,

STAFNE LAW
Advocacy & Consulting
239 N Olympic Avenue
Arlington, WA  98223
(360) 403 - 8700

and from aliens otherwise dangerous or detrimental to the well-being or peace of the State, and to impose conditions upon which persons may reside in the State, and to provide the means and mode of their removal from the State, upon failure or refusal to comply with such conditions; provided, that nothing contained in this Section shall be construed to impair or limit the power of the Legislature to pass such police laws or other regulations as it may deem necessary.

Sec. 2. No corporation now existing or hereafter formed under the laws of this State, shall, after the adoption of this Constitution, employ directly or indirectly, in any capacity, any Chinese or Mongolian. The Legislature shall pass such laws as may be necessary to enforce this provision.

Sec. 3. No Chinese shall be employed on any State, county, municipal, or other public work, except in punishment for crime.

Sec. 4. The presence of foreigners ineligible to become citizens of the United States is declared to be dangerous to the well-being of the State, *and the Legislature shall discourage their immigration by all the means within its power. Asiatic coolieism* is a form of human slavery, and *is forever prohibited in this State, and all contracts for coolie labor shall be void. All companies or corporations, whether formed in this country or any foreign country, for the importation of such labor, shall be subject to such penalties as the Legislature may prescribe. The Legislature shall delegate all necessary power to the incorporated cities and towns of this State for the removal of Chinese without the limits of such cities and towns, or for their location within prescribed portions of those limits, and it shall also provide the necessary legislation to prohibit the introduction into this State of Chinese after the adoption of this Constitution. This Section shall be enforced by appropriate legislation.* (Emphasis added)

    3.16 The California Constitution of 1879 triggered the all-out ethnic cleansing of Chinese and Asian communities in what was known as "The Driving Out."  The employment of persons of Chinese and Mongolian descents was outlawed and state authorities were complicit in empowering lynch mobs that burned Chinatowns and left Chinese corpses in the street.

    3.17 "Article XIX: CHINESE" was promptly found to be unconstitutional under the Fourteenth Amendment, the Supremacy Clause, and the Burlingame Treaty.  *See In re Parrott*, 1 F. 481 (C.C.D. Cal. Mar. 1, 1880).  However, California courts continued to enforce Art. XIX by engaging in racially discriminatory policies and rulings designed to prevent Asians from working and to force them out of the state.  The infamous case of *Yick Wo v Hopkins*, 118 U.S. 356 (1886),

STAFNE LAW
Advocacy & Consulting
239 N Olympic Avenue
Arlington, WA  98223
(360) 403 - 8700

arose from an 1880 San Francisco ordinance designed to close Chinese laundries in the city.  As Justice Matthews memorably stated, this seemingly neutral law was "applied and administered by public authority with an evil eye and an unequal hand."  *Id*. at 373-74.

3.18 Although federal courts declared Art. XIX as unconstitutional in 1880, California continued to enforce it until at least 1952 when Art. XIX was repealed.  In 2009, by concurrent resolution, the California Assembly publicly apologized for state's long history "of systematic, pervasive, and sustained discrimination."  This apology stated in part (*see* Exhibit 2 for full text):

WHEREAS, The Legislature enacted discriminatory laws targeting Chinese in America and Chinese immigrants in order to discourage further immigration from China and sought to severely limit the success of the Chinese laborers already here; and

WHEREAS, Among other things, these laws denied the Chinese in California the right to own land or property, the right to vote, and the right to marry a white person, denied children of Chinese descent access to public schools, denied Chinese immigrants the right to bear arms, unfairly targeted women of Chinese descent by imposing special requirements in order for them to be allowed to immigrate into the state, authorized the removal of Chinese immigrants to outside town and city limits, denied Chinese laborers employment in public works projects and through state agencies, prohibited the issuance of licenses to Chinese in California, denied Chinese in California the right to fish in California's waters, and unduly taxed Chinese businesses and individuals who employed Chinese laborers; and

WHEREAS, Chinese in California were denied the right to testify as a witness in any action or proceeding in which a white person was a party, pursuant to a state law which was upheld in People v. Hall (1854) 4 Cal. 399. As a result of the decision to place Chinese in California outside of the protection of the law, many Chinese in California were left extremely vulnerable to violence and abuse; and

WHEREAS, Chinese in California faced further discrimination under local ordinances which targeted traditional Chinese culture and customs. …
                    *                    *                    *
*WHEREAS, Former Article XIX of the California Constitution, which was adopted in 1879 and unfairly targeted and discriminated against Chinese living in California, remained in effect for 73 years until t was repealed in 1952; and*

WHEREAS, Despite decades of systematic, pervasive, and sustained discrimination, Chinese living in California persevered and went on to make significant contributions to the growth and success of our state;...
                    *                    *                    *

STAFNE LAW
Advocacy & Consulting
239 N Olympic Avenue
Arlington, WA  98223
(360) 403 - 8700

> *Resolved, That the Legislature deeply regrets the enactment of past discriminatory laws and constitutional provisions which resulted in the persecution of Chinese living in California, which forced them to live in fear of unjust prosecutions on baseless charges, and which unfairly prevented them from earning a living. The Legislature regrets these acts and reaffirms its commitment to preserving the rights of all people and celebrating the contributions that all immigrants have made to this state and nation;...* (Emphasis Supplied)

3.19 The California Supreme Court in 2015 apologized for the grievous wrongs California had perpetrated against Chinese people based on race for the benefit of whites. *In re Hong Yen Chang*, 344 P. 3d 288 (Cal. 2015) (posthumously admitting a Chinese lawyer who in 1890 was denied admission to practice law as a result of discriminatory legislation passed pursuant to the 1879 Constitution)

3.20 The 1879 Constitution also destroyed the legal protections promised under the 1848 Treaty of Guadalupe Hidalgo for Mexicans who opted to become U.S. citizens. California began persecuting non-white Mexicans to promote white supremacy shortly after statehood during the Gold Rush frenzy. Hispanics were lynched through vigilante action that went unchecked by authorities. Mob violence against Hispanics was common in the late nineteenth and early twentieth centuries. Historians estimate that thousands of Hispanics were killed through riots and other racially-motivated violence.

3.21 Anti-Mexican sentiment in California spiked during the Great Depression. As the stock market tanked and unemployment grew, whites accused Mexicans and other non-whites of stealing American jobs. The United States, in complicity with California and other states, forcibly removed up to two million people of Mexican descent from the country—*almost sixty percent of whom were American citizens*. In California alone, by the state's own estimate, approximately 400,000 American citizens and legal residents of Mexican ancestry were forced to emigrate to

STAFNE LAW
Advocacy & Consulting
239 N Olympic Avenue
Arlington, WA  98223
(360) 403 - 8700

Mexico.   About one third of Los Angeles' Mexican population was expelled from the country. The consequences of this ethnic cleansing have been far-reaching and continuing.

3.22 Hispanics who managed to stay in California were treated poorly by the state. For example, California discriminated against Mexicans by forcing them to attend segregated schools. *See Westminster School Dist. v. Mendez*, 161 F.2d 774 (9th Cir. 1947).  Due to actions of state actors in California, Hispanics also suffered discrimination in housing, government employment, and access to state services.

3.23 In 2006, the California legislature apologized for the state's historic role in removing persons of Mexican descent from the state, acknowledging in part that "United States citizens and legal residents were separated from their families and country and were deprived of their livelihood and United States constitutional rights." It also recognized U.S. citizens of Mexican origin "were deprived of the right to participate in the political process guaranteed to all citizens, thereby resulting in the tragic denial of due process and equal protection of the laws."  *See* Exhibit 3 (full text of apology).

3.24 Blacks were disenfranchised by California's 1849 Constitution, notwithstanding that in California's Spanish era (1769-1821) and Mexican Era (1821-1848), blacks and persons of mixed African-American ancestry could vote and hold public office.  In those earlier periods, they were elected to important offices, including governor of California and mayor of Los Angeles.  Of the forty-eight delegates elected to the 1849 Constitutional Convention, seven Californians of African ancestry participated.

3.25   From statehood until at least the twentieth century, state actors in California frequently discriminated against blacks with invidious intent in numerous ways, including through enactment of Jim Crow voting restrictions,  segregation of public schools by race, the enactment

of laws that assured racially-segregated housing, and police practices targeting blacks for arrests, brutal treatment, and second class citizenship.

3.26 Because of the cap imposed on the number of state legislators by the 1879 constitution, California's population growth has required each of its 120 legislators to represent ever increasing numbers of people over time. *See* Exhibit 4.  As the state's population grows inexorably, the political influence of each voter will be increasingly diluted, because under the U.S. Supreme Court's interpretation of the Equal Protection Clause, legislative districts must contain substantially the same number of persons.  *See Reynolds v. Sims*, 377 U.S. 533, 577 (1964) (state legislative districts must be "nearly of equal population as is practicable.").

3.27 Although the adverse effects of representative government by enormous legislative districts are felt by all California voters, the interests of members of minority groups—whether they be defined by race, ethnicity, political affiliation, or residence in more sparsely populated areas of the state—are specifically and concretely affected.  Having long suffered from animus and neglect by state actors in California, rural voters are far more in need of legislative protection and relief than white citizens or urban residents, who tend to have far more political clout.

3.28 Currently, each Senator represents approximately 1,000,000 people and each Assembly member represents approximately 500,000 people.  California's representation ratios thus are the worst of all the states by a wide margin. *See* Exhibit 5.  Effectively, a citizen of California has far less voting and political power than citizens of any other state.

3.29 Approximately 38% of California's population is white, 37% is Hispanic, 13% is Asian, and, 6% is black.  Less than 2% of California's population is Native American.  However, as noted, the California legislature has artificially manipulated these population levels over time

through intentional invidious discrimination, including extermination and forced removals, which continues to skew the racial demographics of the state and thus its legislature.

3.30 Whites make up only 38% of California's population, but the cap on the number of legislators gives them greatly disproportionate representation in the legislature.  In 2017-19, the Senate had 31 whites (77.5%), 2 Asian/Pacific Islanders (5%), 2 blacks (5%), and 5 Hispanics (12.5%).  In the Assembly, 37 members are white (46%), 22 are Hispanic (27.5%), 8 are black (10%), and 2 are multiracial (5 %).

3.31 The fact that racial minorities in California have more favorable representation in the Assembly than in the Senate demonstrates that, as the population of legislative districts decreases, non-whites have a significantly greater chance of electing candidates of their choice.

3.32 Plaintiffs identified in ¶ 1.6 reside and vote in geographically large senate districts composed of eight or more counties[2]. People living in such large legislative districts, are prejudiced from running for statewide legislative offices or accessing representatives having similar governmental concerns because candidates from such districts have to pay increased fees and costs to access voters in large geographical areas. For example, the difference in fees and costs to run for offices in large geographic districts as opposed to urban legislative districts can be substantial (i.e. thousands of dollars). This impacts those candidates in such districts ability to run for office and, if elected, serve their constituents.

3.33 Plaintiffs Baird, Carpenters, Hall, D'Agostini, Poindexter, Thomas, Wahl and other similarly situated persons living in geographically large legislative districts are also injured by the vanishing value of their vote because the representatives who represent numerous counties can

---

[2] California Senate District 1 encompasses *eleven counties* and is larger geographically than the State of West Virginia; it is comprised of people and industries so diverse they are impossible to be represented as a single constituency.  By contrast, there are 11 senators who exclusively represent Los Angeles County, and 4 others with parts of that county in their districts.

SECOND AMENDED COMPLAINT                            16                            STAFNE LAW
                                                                                            Advocacy & Consulting
                                                                                       239 N Olympic Avenue
                                                                                       Arlington, WA  98223
                                                                                         (360) 403 - 8700

choose to represent the interests of only those constituents (or non-constituents) who contribute to their campaigns. Despite constituents' petitions and protests, the legislature often refuses to provide for their safety. For example, the Oroville Dam was known for years to have infrastructure problems that could result in spillway failure at any time. Plaintiff Wahl and other Butte County residents could not obtain representation from, nor engage the legislature concerning this well-known problem until after the spillway broke, which then caused the evacuation of almost 200,000 people. This tragedy, caused economic, social, and stigmatic injuries to many people, including plaintiffs (and others similarly situated).

3.34 Because of Baird's participation in this lawsuit and other lawful political activities, he has been retaliated against by the state and local agencies in ways that have harmed his economic and political interests.  For example, because of his political views and participation in this case Baird was placed on an indefinite, unpaid leave of absence from his deputy sheriff job in Siskiyou County.

3.35 California's cap on the number of its legislators, and the laws enacted by this legislative oligarchy, has created a situation which today is no longer consistent with the federal structure of government mandated by numerous U.S. constitutional provisions and amendments.

## V.  CAUSES OF ACTION

### Count One by ALL PLAINTIFFS: Violation of the Equal Protection Clause of the Fourteenth Amendment (Intentional Race Discrimination in Limiting Suffrage and Capping the Size of California's Legislature)

4.0 The caps on the legislature's size, which originated in the 1849 and 1879 constitutions, violate the Equal Protection Clause of the Fourteenth Amendment because their strict limits on the total number of state legislators were enacted to ensure that a small group of white males would control the state legislature.

SECOND AMENDED COMPLAINT                         17

4.1 A consequence of these and other constitutional provisions is that non-whites were unrepresented in both the state Senate and Assembly for decades. During this period a capped number of legislators was both permitted and required to enact **intentionally** discriminatory legislation against certain peoples who were not white. This strategy prevented the election of any non-white Hispanic or Asian members to either of California's statewide legislative bodies until the mid-twentieth century, and **prevented and still** prevents all plaintiffs from obtaining meaningful representation from the legislators in their districts. This system, which was constitutionally designed to invidiously discriminate against non-whites, to dilute their votes and access to legislative power, has caused each of them specific and concrete harms, including economic and stigmatic injuries.

4.2 The resulting discrimination in violation of the Equal Protection Clause is intractable because current members of the California legislature would dilute their own political power by amending the state constitution to increase the sizes of the Assembly and Senate. Regardless of whether current individual legislators are motivated by racial animus, preserving their own political power motivates a majority to rebuff any efforts to enlarge the legislature, thereby perpetuating the original sin of constructing the Assembly and Senate so as to assure statewide legislative bodies that perpetuate representation based on race.

4.3 The resulting discrimination in violation of the Equal Protection Clause will inexorably worsen as the population of the state grows and legislative districts become increasingly larger under the U.S. Supreme Court's command that legislative districts must contain substantially the same number of people.

STAFNE LAW
Advocacy & Consulting
239 N Olympic Avenue
Arlington, WA  98223
(360) 403 - 8700

**Count Two by NON-WHITE PLAINTIFFS: Violation of the Equal Protection Clause of the Fourteenth Amendment (Intentional Race Discrimination in Maintaining the Cap on the Size of the Legislature notwithstanding increased Suffrage)**

5.0 The California Constitution violates the Equal Protection Clause of the Fourteenth Amendment because its strict limit on the total number of state legislators has been and continues to be intentionally maintained to the detriment of non-whites.

5.1 California politics today, as always, are affected by racial considerations.  Racial tension, including race riots, has been a dominant characteristic of California since its founding. Bloc voting by race is a characteristic of California politics, as elsewhere.  Consequently, white legislators in California know that smaller districts will diminish their electoral prospects by increasing the percentage of voters of various races within them.

5.2  A significant expansion of the size of the legislature would have obvious racial impacts as more racial minorities would be elected to the legislature.  White legislators in California have a strong motivation to maintain the status quo as any significant shrinkage of their districts would likely result in much greater minority voting strength, to the detriment of their political careers.

5.3  A motivating factor for the legislature's rebuffing of any effort to amend the constitution to expand its **numbers has been to** ensure that a small cadre of political elites dominate the legislature.

5.4 The resulting invidious discrimination **in** violation of the Equal Protection Clause will inexorably worsen and continue to harm the non-white plaintiffs as the population of the state grows and legislative districts become increasingly larger under the U.S. Supreme Court's command that legislative districts must contain substantially the same number of people.

STAFNE LAW
Advocacy & Consulting
239 N Olympic Avenue
Arlington, WA  98223
(360) 403 - 8700

**Count Three by ALL PLAINTIFFS: Violation of the Equal Protection Clause (California's Enormous Legislative Districts Deny Citizens the Ability to Obtain Equal Protection from the Legislature)**

6.0 The Equal Protection Clause requires not only equitable enforcement of the laws, but equal treatment of persons in legislation and other state action.

6.1 As the sizes of legislative districts grow, the ability of individual citizens to protect their interests through appeals to their legislators diminishes.

6.2 In California, citizens vote in such large legislative districts that individual citizens have no meaningful influence over legislative actions, which deprives them of equal protection of the laws because legislative actions are dominated by a small group of legislators influenced more by wealthy donors and special interests than ordinary citizens. These underrepresented populations include members of minority political parties, residents of rural areas with sparse populations, Native American tribes and their members, and rural municipalities, as well as Californians who are not wealthy and lack effective access to the political elites that dominate the legislature.

6.3 California is an outlier among all the states in maintaining enormous legislative districts. Consequently, a Californian has far less political power than is the norm for the rest of the United States. A person who moves from another state to California suffers an immediate and continuing loss of political influence over the making of state laws.

6.4 The resulting discrimination in violation of the Equal Protection Clause will inexorably worsen as the population of the state grows and legislative districts become increasingly larger under the U.S. Supreme Court's command that legislative districts must contain substantially the same number of people.

STAFNE LAW
Advocacy & Consulting
239 N Olympic Avenue
Arlington, WA  98223
(360) 403 - 8700

6.5 At some point, voting becomes a futile exercise and voter turnout suffers. As electoral districts grow in population and geographic size, voter turnout shrinks. As the Los Angeles Times observed on March 14, 2015:

> [Defendant Secretary Alex] Padilla recently testified to lawmakers that the primary reasons people don't vote include apathy — such as the feeling that their vote won't make a difference — and a lack of knowledge that an election is being held.

### Count Four by ALL PLAINTIFFS: Violation of the Due Process Clause of the Fourteenth Amendment (Denial of the Fundamental Right of Adequate Representation and a Meaningful Chance for Election to the Legislature)

7.0 Voting is a fundamental right under the Due Process Clause of the 14th Amendment. A corollary of the right to vote is the fundamental right to adequate representation. Voting is pointless if voters systematically have their vote devalued and as a result representatives have no incentive to actually represent all their constituents.

7.1 California denies plaintiffs the fundamental right of adequate representation by maintaining legislative districts so large that millions of state residents have no meaningful access to their representatives to express political interests and obtain appropriate redress. California makes the casting of ballots meaningless, thereby discouraging participation in the political process through voting and running for office. As noted, voter turnout is directly correlated to ratios of representation.

7.2 Consequently, a significant percentage of California voters have substantially greater difficulty obtaining benefits and services from the state than voters whose wealth and social status give them access to legislators for political purposes. The modern legislator's role includes not only voting but also providing direct services to constituents. Ordinary citizens without political power in huge legislative districts have far greater difficulty obtaining the assistance and attention

STAFNE LAW
Advocacy & Consulting
239 N Olympic Avenue
Arlington, WA  98223
(360) 403 - 8700

from their legislators than those with wealth and political connections to the elites that actually control the legislature.

### Count Five by ALL PLAINTIFFS: Violation of the First Amendment

8.0 The California Constitution violates the First Amendment because its strict limit on the total number of state legislators was enacted and has been maintained at least in part for the purpose of suppressing and retaliating against the political expression of state residents who advocate viewpoints contrary to the political elites that control the legislature.

8.1 Because the expression of ordinary citizens without political power in huge legislative districts can and has been is ignored by their representatives, they have far greater difficulty obtaining the assistance they deserve and need from their legislators than those with wealth and political connections to the elites that control the legislature.  A motivating factor for California maintaining these large districts at least in part is that enlarging them significantly would almost certainly enhance the political power of those with minority viewpoints.  Further, citizens with the temerity to challenge the dominant elites in the legislature have suffered retaliation from state actors for their political efforts.

8.2 Plaintiff Baird, for example, has been discriminated against because of **his** criticism of California's lack of statewide legislative representation, support for the Jefferson movement, and participation in this lawsuit. The most recent retaliation was the loss of his job as a deputy sheriff for Siskiyou County.

### Count Six BY ALL PLAINTIFFS: Violation of the Guaranty Clause of the Constitution

9.0  Under Article IV, § 4 of the Constitution, "[t]he United States shall guarantee to every State in this Union a Republican Form of Government."  If a state ceases to be a republican government, the United States is constitutionally obligated to take appropriate corrective action.

STAFNE LAW
Advocacy & Consulting
239 N Olympic Avenue
Arlington, WA  98223
(360) 403 - 8700

9.1  California no longer has a functioning "republican form of government" under the original meaning of that term in the U.S. Constitution.

9.2  The guarantee of a republican form of government was intended to assure that none of the states would become monarchical or oligarchical forms of government, in which political power was controlled by the hands of a few.

9.3  At the time of the creation of the U.S. Constitution, a "republican form of government" was commonly understood to require legislative districts that were small enough to assure that the people of the states could monitor and effectively control their legislators.

9.4  The colossal size of California's legislative districts assures that the great majority of residents have no effective influence on either the election of or actions of their legislators.  Because the modern understanding of a legislator's role includes not only voting but also providing direct services to constituents, ordinary citizens without political power in huge legislative districts have far greater difficulty obtaining the assistance they deserve from their legislators than those with wealth and political connections to the elites that control the legislature.

9.5 California's failure to provide its people with a republican form of government is intractable because current members of the California legislature would dilute their own political power by amending the state constitution to increase the sizes of the Assembly and Senate.

9.6 This ongoing constitutional violation will be exacerbated by inevitable future increases in the state population.

9.7 California's failure to maintain a republican form of government presents a justiciable controversy under Article III of the Constitution because neither of the other branches of government has the power under the Constitution to order changes in the state constitution.  By determining that California does not have a republican form of government within the meaning of the Constitution, and ordering redress of this violation, this Court would not interfere with the powers or prerogatives of either the Executive or Congress.

9.8 The colossal size of California's legislative districts ensures that the great majority of residents have no effective influence on either the election of or actions of their legislators. As the modern understanding of a legislator's role includes not only voting but also providing direct services to constituents, ordinary citizens without political power in huge legislative districts have far greater difficulty obtaining the assistance they deserve and require than those with wealth and political connections to the elites that control the legislature.

9.9 California's failure to maintain a republican form of government presents a justiciable controversy under Article III of the Constitution because neither of the other branches of government has the power under the Constitution to order changes in the state constitution. By determining that California does not have a republican form of government within the meaning of the Constitution, and ordering redress of this violation, this Court would not interfere with the powers or prerogatives of either the Executive or Congress.

## VI.  PRAYER FOR RELIEF

To redress the ongoing constitutional violations described in this complaint, Plaintiffs request that the Court order one or more of the following forms of relief:

1. Declaratory Judgment

10.0  Plaintiffs request that this Court enter a declaratory judgment pursuant to 28 U.S.C. § 2201, determining that the caps on the size of the California Assembly and Senate are unconstitutional and must be redressed by the state.

10.1  Plaintiffs request that this Court (a) grant the defendants a reasonable period of time, not to exceed two years, to cure these constitutional violations, (b) require the defendants to report periodically to the Court as to what measures it has adopted to remedy the violations, and (c) retain jurisdiction over this case until the constitutional violations have been cured.

SECOND AMENDED COMPLAINT                    24                    STAFNE LAW
                                                                  Advocacy & Consulting
                                                                  239 N Olympic Avenue
                                                                  Arlington, WA  98223
                                                                  (360) 403 - 8700

2.  Injunctive Relief

10.2 Plaintiffs request this Court to enter an injunction requiring that the number of elected members of the Assembly and Senate be increased to a number, as determined at trial, which will assure (a) that voters who have been discriminated against on the basis of race as identified in this complaint have a meaningful opportunity to elect their preferred candidates; and (b) that voters in sparsely populated rural areas have a meaningful opportunity to elect their preferred candidates.

3. Other Relief

10.3 For such other relief as may be appropriate under the Constitution, law and/or equity to provide an appropriate remedy for the facts pled in this complaint.


DATED this 19th day of March, 2018.

Respectfully Submitted,

BY:      /s/ Scott E. Stafne

Scott E. Stafne, Attorney *Pro Hac Vice*

WSBA # 6964

STAFNE LAW

*Advocacy & Consulting*

239 N. Olympic Avenue

Arlington, WA  98223

(360) 403-8700


   /s/ Gary L. Zerman

Gary L.   Zerman, Attorney

CA BAR # 112825

23935 Philbrook Avenue

Valencia, CA 91354

(661) 259-2570


*Attorneys for Plaintiffs*


SECOND AMENDED COMPLAINT                          25

CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on this date I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to those attorneys of record registered on the CM/ECF system.  All other parties (if any) shall be served in accordance with Federal Rules of Civil Procedure.

DATED this 19th day of March, 2018.

BY:   _____/s/Pam Miller_____
                Pam Miller, Paralegal

STAFNE LAW
Advocacy & Consulting
239 N Olympic Avenue
Arlington, WA  98223
(360) 403 - 8700