UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITIZENS FOR FAIR REPRESENTATION, et al., | No. 2: 17-cv-00973-KJM-DMC |
| Plaintiffs, | |
| v. | ORDER |
| SECRETARY OF STATE ALEX PADILLA, | |
| Defendant. | |

A voting rights organization, several local government entities, independent political parties and various individual California voters jointly sue California's Secretary of State, Alex Padilla, arguing the cap on state legislators encumbers certain citizens' right to self-governance. Plaintiffs' initial complaint alleged that the California legislature is too small to adequately represent California's nearly 40 million residents. The court dismissed that complaint as nonjusticiable. Plaintiffs amended the complaint, and defendant again moves to dismiss the complaint as nonjusticiable. Mot., ECF No. 42. Plaintiffs oppose. Opp'n, ECF No. 46. The court heard the motion on June 14, 2018. H'rg Mins., ECF No. 52. As explained below, the court GRANTS defendant's motion to dismiss, but this time without leave to amend.

I.  BACKGROUND

In its prior dismissal order, the court reviewed the relevant historical and political backdrop, which remains the same. *See* Prior Order, ECF No. 32, at 2-4 (Feb. 1, 2018). The background information provided below focuses primarily on plaintiffs' amended allegations as relevant to the motion to dismiss.

A.  Plaintiffs

The following entities and individuals and the plaintiffs who claim an interest in expanding their access to and representation within state and local government:

- Citizens for Fair Representation, a nonprofit whose members are California voters and government officials, alleges an interest in competitive elections and democratic representation. *See* Second Am. Compl., ECF No. 39 ("SAC"), ¶¶ 1.0-1.2.
- The California Libertarian Party and the California American Independent Party, minority political parties with an alleged interest in enhancing the voting power of non-white Californians. *Id.* ¶ 1.7.
- Win Carpenter, Kyle Carpenter and Chief Roy Hall, Jr., members of the Shasta Tribe of Indians with an alleged interest in promoting the tribe's self-governance through greater government access and the avoidance of the state's "intentional attempted genocide of their race" and the "decimation of the Native American population." *Id.* ¶ 1.2.
- David Garcia, a Latino American with an alleged interest in empowering the votes of all Hispanics and repairing their "grave economic, social, and stigmatic injuries." *Id.* ¶ 1.3.
- Raymond Wong and Leslie Lim, Asian Americans with an alleged interest in addressing the "intentional killing, forced expulsion, internment, and other intentional discrimination based on their race from the 1850s through at least the 1950s," of which the legislative cap "is an integral part." *Id.* ¶ 1.4.

- Cindy Brown, an African American with an alleged interest in rectifying the "intentional[], systematic[], and invidious[] discriminat[ion]" against "brown and other blacks . . . that have been formally admitted by the state, including being denied the right to vote . . . [being] subjected to 'Jim Crow' race laws . . . [being] subjected to voter disenfranchisement for felony convictions" and being denied adequate "black political power" to for example, "oversee the corruption of California's judges and courts that incarcerate and impose felony sentences (which impacts the right to vote) of non-whites." *Id.* ¶ 1.5.
- Plaintiffs Mark Baird, Win and Kyle Carpenter, John D'Agostini, Mike Poindexter, Michael Thomas and Larry Wahl, all individuals in various districts who allege "this dilution of political power has [caused them] grave economic, social, and stigmatic injury." *Id.* ¶ 1.6.
- The cities of Colusa and Williams, rural municipalities that allege the state legislative cap "was born out of the invidious discrimination against non-whites described herein, [and] now causes them injury." *Id.*

B. <u>Allegations in the Complaint</u>

Alleging that a refusal to increase the total number of elected representatives is an arbitrary violation of several federal constitutional guarantees, plaintiffs sue California Secretary of State Alex Padilla in his official capacity. *Id.* ¶ 1.9.[1] Specifically, plaintiffs challenge the current legislative cap of 40 Senators and 80 Assemblymembers, which has been fixed by the California Constitution since the late 1800s despite considerable population growth since then. *Id*. ¶¶ 3.14, 3.26; *see also* Prior Order at 3. Plaintiffs allege this legislative cap has created an unresponsive legislative oligarchy "to promote the white man's interests by the exclusion of non-white people from participating in California's political process." SAC ¶ 3.14. Plaintiffs further allege California has a long history of discriminating against minority groups and that although

---

[1] Although the complaint also names the State of California and the State's Redistricting Commission as defendants, *see* SAC ¶¶ 1.9-1.10, at hearing plaintiffs' counsel clarified that plaintiffs intend to sue only Secretary of State Padilla.

3

the current populous legislative districts harm all voters, the most injury falls on "members of minority groups" including racial and ethnic minorities, political minorities, less wealthy citizens and people that live in less populated areas. *Id.* ¶ 3.27. Plaintiffs further allege the dilution of power resulting from the legislative cap impedes their access to state services and assistance, thwarts their efforts to elect minority legislators or to run for office, and gravely injures them socially, economically and "stigmatic[ally]."[2] *Id.* ¶¶ 1.3, 1.4, 1.6, 3.0, 3.22, 3.32, 3.33, 7.2, 9.4, 9.8.

Plaintiffs assert six claims. They claim the legislative cap violates all plaintiffs' right to equal protection (Claim 1), but particularly non-white plaintiffs (Claim 2) and plaintiffs with less political power, "from rural areas, minority political parties and lower socio-economic brackets" (Claim 3). *Id.* ¶¶ 4.0-6.5. They allege the State's legislative cap impedes each plaintiff's access to government benefits and services in violation of each plaintiff's due process guarantees (Claim 4); that this cap "was enacted and is maintained to suppress and retaliate against residents who advocate viewpoints contrary to the political elites" in violation of First Amendment free speech guarantees (Claim 5); and that this cap "assure[s] that the great majority of residents have no effective influence on their legislators" in violation of the guarantee to a republican form of government (Claim 6). *Id.* ¶¶ 7.0-9.9.[3]

Plaintiffs seek a declaration that the current sizes of the State Assembly and Senate are unconstitutional and they seek an injunction requiring that the number of state legislators "be increased to a number, as determined at trial, which will assure . . . voters who have been discriminated against . . . have a meaningful opportunity to elect their preferred candidates" and "voters in sparsely populated rural areas have a meaningful opportunity to elect their preferred candidates." *Id.* ¶ 10. Plaintiffs also ask that the court "grant" the state up to two years "to cure

---

[2] Plaintiffs do not provide further allegations to clarify what they mean by their use of "stigmatic," although it context it appears they are suggesting underrepresentation perpetuates minority distrust in the democratic process.

[3] Five of the six claims are brought by "all plaintiffs" without differentiation. Claim 2, however, is brought only by "non-white plaintiffs," without identifying those plaintiffs by name in this part of the complaint. *See* SAC ¶¶ 5.0-5.4.

these constitutional violations" but then "retain jurisdiction" over the dispute to ensure the state does so. *Id.*

C. Procedural History

Plaintiffs first filed this lawsuit in May 2017 and requested that it be heard by a three-judge court. ECF No. 1; 28 U.S.C. § 2284(a) (providing three-judge court should hear lawsuits "challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body"). Because jurisdiction is still in question, this court has not requested the convening of a three-judge court. *See* Aug. 24, 2017 Min. Order, ECF No. 22 ("the court has determined it is premature to request the convening of [a three-judge] court prior to this court's threshold determination of jurisdiction and justiciability") (citing *Shapiro v. McManus*, 136 S. Ct. 450, 455 (2015)); *see also* Aug. 1, 2018 Order, ECF No. 63 ("Until the court resolves defendant's motion and unless or until it determines a federal court has jurisdiction over plaintiffs' amended complaint, the court continues to find that convening a three-judge court would be premature.").

On February 1, 2018, the court dismissed plaintiffs' First Amended Complaint with leave to amend for lack of subject matter jurisdiction. *See* Prior Order. The court explained plaintiffs lacked standing and the requested relief would require the court to adjudicate nonjusticiable political questions. *Id.* at 4-10. Defendant now moves to dismiss the Second Amended Complaint on the same jurisdictional grounds. *See* Mot. at 11-16 (arguing plaintiffs still lack standing and the complaint still raises nonjusticiable political questions). Plaintiffs oppose, Opp'n, and defendant has filed a reply, ECF No. 50.

II. SUBJECT MATTER JURISDICTION

Defendant moves to dismiss plaintiffs' complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See* Mot. at 10-16. When, as here, a motion to dismiss facially attacks the complaint's reliance on subject matter jurisdiction, the court presumes all allegations are true and analyzes whether the allegations plausibly establish jurisdiction. *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003)

(citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)). As explained in the Prior Order, the federal constitution's central concept of separation-of-powers defines and limits what grievances a federal court may hear. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-60 (1992). As the parties invoking the court's subject matter jurisdiction, plaintiffs have the burden to establish it. *Id.* at 561.

A. <u>Standing</u>

Every plaintiff must have standing to litigate a grievance before a federal court. *Id.* at 560. As in their first motion to dismiss, defendant argues plaintiffs lack standing to sue because they assert only a generalized grievance common to all Californians. *See* Mot. at 11-13.

To establish standing to sue, plaintiffs must allege an injury particularized to each plaintiff or each group of plaintiffs; the injury cannot be a general grievance "'where [the plaintiff's] own injury is not distinct from that suffered in general by other taxpayers or citizens.'" *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 598 (2007) (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 613 (1989)); *see also Lujan*, 504 U.S. at 560.

Here, after amendment, the operative complaint still identifies only generalized grievances. Plaintiffs allege that "[a]lthough the adverse effects of representative government by enormous legislative districts are felt by all California voters, the interests of members of minority groups . . . are specifically and concretely affected." SAC ¶ 3.27. But plaintiffs define "minority groups" so broadly that the definition supports the court's reaching the same conclusion it did before in response to the first motion to dismiss: The grievance identified is shared by virtually all Californians. Specifically, plaintiffs allege the impacted minorities include voters of Asian descent, of Hispanic descent, and of African descent; voters that live in "more sparsely populated areas of the state"; voters with certain "minority" political views; and voters who are "not wealthy." *See* Opp'n at 9-15; SAC ¶¶ 3.27, 6.2. Although they do not allege a generalized grievance on behalf of every single Californian, plaintiffs claim a generalized grievance on behalf of virtually every Californian, noting only two exceptions by name. *See* Opp'n at 13 (citing two "wealthy Californians living in geographically-concentrated legislative districts," Mark Zuckerberg and Nancy Pelosi, each of whose voting power allegedly remains strong).

Even if the alleged interference with the right to self-governance affects each Californian differently, nothing in the complaint makes out a claim that the plaintiffs' individualized experiences transform the underlying grievance from the general to the particular. Rather, the alleged injury underlying each individual's hardship is unequivocally generalized: "As the state's population grows inexorably, the political influence of each voter will be increasingly diluted." SAC ¶ 3.26.

The Supreme Court has "consistently held" that generalized grievances such as the one plaintiffs plead here fall outside the court's Article III power. *See Lance v. Coffman*, 549 U.S. 437, 439 (2007) (listing cases; explaining plaintiff "claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220-21 (1974) (interest held by all members of public is necessarily abstract and cannot establish standing); *Hein*, 551 U.S. at 606-08 (taxpayers lacked standing to challenge President's "faith-based initiatives" where their injury was not distinct from that suffered by other taxpayers). As in these cases decided by the Court, plaintiffs' core allegation here is too generalized to support standing.

Plaintiffs' attempt to draw parallels to historical voters' rights cases is misplaced. For instance, the justiciability concerns in this case differ from those in the case of *Federal Election Comm'n v. Akins*, 524 U.S. 11 (1998), in which voters had standing to sue based on a "widely shared" voter injury: The denial of access to certain public records relevant to a recent election. *Id.* at 24. The Court explained that just because "an injury is widely shared . . . does not, by itself, automatically disqualify an interest for Article III purposes." *Id.* But *Akins* dealt with standing that was specifically provided by the Federal Election Campaign Act ("FECA"): Any voter could sue under FECA if she was denied campaign information that must be publicly available under the statute. *Id.* at 21; *cf. Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) (holding denial of public records request "constitutes a sufficiently distinct injury to

provide standing to sue."). Here, because there is no statutorily-prescribed right to sue, *Akins* does not support finding plaintiffs have standing to pursue this case.

This case also is distinguishable from cases involving gerrymandering, poll taxes or all-white primaries. *See United States v. Hays*, 515 U.S. 737, 744–45 (1995) (racial gerrymandering); *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (same); *Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966) (poll tax); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (all-white primaries). Race-based gerrymandering, poll taxes as a voting precondition and primaries for only white voters arbitrarily deny racial minorities their right to vote compared to other citizens. In contrast, in this case, the alleged underrepresentation and inaccessibility to government of which plaintiffs complain is common to virtually all Californians: The legislative cap does not apply differently to shape certain districts only, or impose voting requirements that affect voters in some districts more than others; it applies equally across districts, inflicting the same alleged injury throughout the state, even if that injury may be felt differently by certain minority populations. *See* SAC ¶ 3.26 ("California's population growth has required each of its 120 legislators to represent ever increasing numbers of people over time . . . . As the state's population grows inexorably, the political influence of each voter will be increasingly diluted.").

This case also presents a different question than that posed in *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999). There, "every voter" in Indiana had standing to challenge the planned use of statistical sampling for the upcoming national census because the proposed method would have eliminated one of Indiana's seats in the federal House of Representatives, thus diluting every Indiana resident's vote relative to voters in other states. *Id.* at 332. In contrast here, plaintiffs do not allege that any single voter has less power than another; rather, plaintiffs allege California voters are steadily losing power generally over time, through population growth. *See* SAC ¶ 3.26.

As the court explained in the Prior Order, comparisons to *Baker v. Carr*, 369 U.S. 186, 211 (1962), are misplaced. In *Baker*, the challenged apportionment scheme progressively diminished voting power in five specific districts, while voting power in other districts progressively strengthened in the absence of any reapportionment after sixty years of steady

8

population growth. *Id.* at 207-08. But here, plaintiffs allege residents in every district in California face the same alleged underrepresentation and inaccessibility to government as a result of the legislative cap. They even plead that whatever new legislative cap they want the court to choose should be applied in every district, further illustrating that the alleged injury here applies to every voter across all districts. SAC ¶ 3.26 ("[U]nder the . . . Equal Protection Clause, legislative districts must contain substantially the same number of persons.") (citin*g Reynolds v. Sims*, 377 U.S. 533, 577 (1964)).

In sum, without an injury sufficiently particularized to their circumstances, plaintiffs have not established standing.

B. <u>Political Question Doctrine</u>

Even if they had satisfied standing, plaintiffs' claims are nonjusticiable because the requested injunctive relief turns on the resolution of political questions better suited to legislative resolution. Mot. at 13-16. The original complaint was dismissed in part for this very reason. Prior Order at 9-10. As the court there explained, "Increasing the numbers of legislators would appear to be susceptible to constitutional amendment . . . yet plaintiffs bring this grievance to federal court, effectively asking the court to usurp the electorate and unilaterally alter the state constitution . . . ; a task committed to the legislative branch." *Id.* at 9 (citing *Baker*, 369 U.S. at 210).

The same conclusion applies here in light of the amended pleadings. Plaintiffs again request "an injunction requiring that the number of [state legislators] be increased to a number, as determined at trial, which will assure . . . voters who have been discriminated against . . . have a meaningful opportunity to elect their preferred candidates; . . .[and] voters in sparsely populated rural areas have a meaningful opportunity to elect their preferred candidates." SAC ¶ 10.2. Plaintiffs contend they have remedied any justiciability concern by asking the court to first defer to the California Legislature by granting that body up to two years to fix the constitutional inadequacies on its own. *Id.* ¶ 10.1. Plaintiffs argue that with this request, "[i]t is entirely possible that this court will need do no more than declare the status quo unconstitutional" and leave the rest to the legislative branch. Opp'n at 17. In the same breath, plaintiffs concede

9

"the unlikelihood of legislators acting to diminish their own local authority defaults," *id.* at 16, and ask the court to "retain jurisdiction over the case until the constitutional violations have been cured." SAC ¶ 10.1.

Practically speaking, plaintiffs' request remains the same, even while building in a two-year delay: If legislators do not gather the support necessary to enact a constitutional amendment that dilutes their own power within two years, plaintiffs ask the court to step in to ensure the change is made. *See* SAC ¶ 10.1; Opp'n at 16-17. In effect, plaintiffs ask the court to serve a legislative function by, at a minimum, declaring the current legislative cap unconstitutionally low. SAC ¶¶ 10.0, 10.1, 10.2; Opp'n at 17-19. Such a determination would require the court to weigh competing policy interests; evaluate "opinions from political scientists;" and select a new minimum number of legislators per district that would assure "members of minority groups" have "reasonable opportunities to elect candidates of their choice," reasonable access to their representatives, and voting power that mirrors their majority counterparts. Opp'n at 18. The court cannot engage in this sort of political evaluation by relying on "judicially manageable standards," which are steeped in a well-established body of case law and constitutional dictates, *see Baker*, 369 U.S. at 210, 226 ("Judicial standards under the Equal Protection Clause are well developed and familiar, and . . . [have] been open to courts since the enactment of the Fourteenth Amendment"), as compared to legislative standards that consider the ever-evolving interests of the citizens they serve, *see Miller v. Johnson*, 515 U.S. 900, 914 (1995) (districting decisions "implicate a political calculus in which various interests compete for recognition"). *See also Vieth v. Jubelirer*, 541 U.S. 267, 280-81, 285-86 (2004) (in gerrymandering context, there are "no judicially discernible and manageable standards" for redistricting determinations; "the Constitution clearly contemplates districting by political entities . . . and unsurprisingly that turns out to be root-and-branch a matter of politics."); *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973) ("The reality is that districting inevitably has and is intended to have substantial political consequences"); *cf. Holder v. Hall*, 512 U.S. 874, 881, 885, 891 (1994) (five justices agreeing with proposition there is no discoverable benchmark for

determining appropriate size of legislative districts) (Kennedy, J. and Rehnquist J. (opinion); O'Connor, J. (partial concurrence); Thomas, J. and Scalia, J. (separate concurrence))._

Finally, the court is unpersuaded by the "*dissents* in the great reapportionment cases" that plaintiffs argue the court should follow. Opp'n at 16 (original emphasis). It is not for a trial court to rewrite from the bottom up the law established by the Supreme Court. As the majority in *Vieth* aptly observed, the fact that the dissenters in that case "come up with [] different standards" among themselves "goes a long way to establishing that there is no constitutionally discernible standard" by which courts might properly engage in redistricting. *See* 541 U.S. at 292.

Plaintiffs' requested relief turns on political questions that lie outside the bounds of this court's powers, which are proscribed.

III.  CONCLUSION

Plaintiffs' alleged grievance is too generalized to establish standing to sue in federal court. Plaintiffs' requested relief would also require the court to resolve non-justiciable political questions. Accordingly, the court DISMISSES the complaint under Rule 12(b)(1) for lack of subject matter jurisdiction.

Having carefully considered the question, and noting that plaintiffs already have been granted an opportunity to cure the absence of standing, the court finds no further amendment could salvage plaintiffs' claims. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (courts consider any potential futility before granting leave to amend). Accordingly, dismissal is without leave to amend.

This resolves ECF No. 42. The Clerk of the Court is directed to CLOSE this case.

IT IS SO ORDERED.

DATED: November 28, 2018.

_____
UNITED STATES DISTRICT JUDGE